Stanley Gartenstein, J.
With all the focus on child abuse and neglect proceedings in recent years, the court is at a loss to understand why the specific admonitions contained herein should not have been self-evident. Be that as it may, the court is more interested in planning for the future than in fixing blame for the past and accordingly, this opinion will make only the briefest possible reference to the underlying facts and the reasons for this decision.
The petition herein alleges that on August 13, 1972, respondent “ Smith”, the paramour of the respondent mother of the subject children, beat the child Michael, age 7, with a leather belt about the neck, shoulders, back and buttocks, at the direc-' Ion of the mother, so severely that he had to be hospitalized. *168 The three younger children were added to the petition by the court on August 15,1972 and appropriate paroles to responsible relatives made on that day with orders of protection against the mother and her paramour. On September 8, 1972, because the relatives could not continue as temporary custodians of the children, a temporary remand of all children was made to the Commissioner of Social Services, who had the children sheltered at a particular facility the name of which is irrelevant at this point. The Commissioner was not the moving party instituting these original proceedings, but became an interested party at the time of this remand. The allegations of the petition were sustained on October 13, 1972 against both respondents and a finding was made. The children were continued on remand and an investigation and report was ordered which was to contain a psychiatric evaluation of the respondents. On December 8, 1972, a further psychiatric evaluation was ordered on the issue of possible abuse of the other children and the children were again continued on remand. On December 20, 1972, the remand was again continued with privilege of parole to an aunt for four days during Christmas, again secured by an order of protection. On January 26, 1973, a dispositional hearing was held at which the court determined it would under no circumstances return these children to the respondents.
The court then placed these children with the Commissioner of Social Services with specific instructions that they were to be placed together in one foster home. Because of certain facts called to the attention of the court which indicated that the children — and Michael in particular — were not doing well in the temporary shelter in which they had been for too long without meaningful planning, the Commissioner was directed to report at the end of a two-week period as to where the children were placed. It was the intention of the court to see to it that the children did not languish forgotten in a shelter, under circumstances wherein no report to the court would be forthcoming under the best conditions for at least four months. On February 9, 1973, a report as ordered by the court was forthcoming to the effect that the children were still in limbo. The court then vacated the placement and changed it to a temporary remand to the same facility, thus insuring a continuity of reports on specific adjourned dates, and directed a progress report by March 2, 1973. On the new adjourned date, the story was unchanged and temporary remand was again continued to March 23,1973 with the court again urging that action be taken for the best welfare of these children. On the next adjourned date, the *169 same result was reported, at which point the court, seeing that these children had been in shelter for almost seven months from the date of the first remand, directed the Law Guardian to explore alternative planning. On recall, the Law Guardian reported to the court that he had been successful, in the one hour which had elapsed, in substantially accomplishing what others claimed to be virtually impossible and the case was scheduled for March 27, 1973, the first available court date over the intervening weekend, for appearance of the prospective foster parents. The agency then appeared on the new adjourned date to report that a foster home had indeed been found over the intervening weekend where all four children could live together. The court chooses this alternative as the best available.
The court is puzzled that, in the face of specific directions making its intent painfully clear, its will was not accomplished until the very moment it was ready to turn elsewhere — and this within one or two days after protestations that the arrangements demanded by the court in the children’s best interests and unaccomplished in close to seven months were virtually impossible.
It is argued that a temporary remand having been in effect during the intervening months, neither the Commissioner nor the agency could undertake meaningful planning. The court is requested to issue a guide as to what it expects on a remand situation prior to actual placement. In a spirit of positive co-operation then, the court makes clear its expectations.
Many sociological writers and theorists inquire why it is that horribly abused or neglected children sometimes close ranks with their assaultive parents when investigations of these con- ■ ditions are in progress. Obviously, the fear of being “ taken away ” from a parent, no matter how horribly that parent treats the child, often motivates the child in efforts to conceal the extent of his being abused. The fear of being “ sent somewhere ” — of the unknown — is so strong that it overrides the child’s knowledge that if he remains where he is, continuing abuse will be a certainty. Knowing of this fear, an agency certainly must be held to the knowledge that at the moment it receives a child who has been removed from his home by court intervention, that child is at his most vulnerable, homeless, afraid, insecure. The time therefore to address these fears is at the very beginning— during the temporary remand — rather than after lengthy court proceedings up to and after the finding of abuse or neglect. If the child is placed in cold storage, it takes no particular sensitivity to realize that this same child who felt unworthy when *170 abused, is lowered in Ms own esteem even more by being forgotten. Is it any wonder that, as here, the child becomes hostile, acts out, and a problem? If his needs are not met at his first point of contact with that instrumentality which purports to save him by taMng him from his home surroundings, whatever therapy society can provide thereafter will be after-the-fact, inadequate and a band-aid used to set a multiple fracture.
The agencies serving this court do so under a crushing burden, given inadequate funding and facilities. They are staffed by dedicated persons whose ideals and aims correspond to those-of the court. The court prefers to think that a failure of communication is responsible for what must otherwise be designated as unconscionable delay. The first remedy therefore must be an opening of channels of communication so that responsible persons actually hear what they are supposed to be hearing, toward the end that they may act upon it.
So that there be no mistake in the future, the court will expect, in situations where placement appears to be a possibility — • and this is so in the overwhelming volume of cases of sustainable abuse — (and who should know better than the Commissioner’s representatives or the agency how strong the allegations are or what evidence will be ultimately produced?) that the Commissioner and/or the agency receiving children under his aegis immediately explore the available alternatives toward the end of having standby plans ready for implementation when these alternatives are presented to the court. There is absolutely no reason why children must remain in temporary shelter for any appreciable time without effort being made to assemble the raw data necessary for the court to consider in making its final order. Why was appropriate testing and interviewing not taking place during the lengthy remand? Why did the agency not have prepared an appropriate list of foster families ready to care for these children?
There is no justification for undertaking planning and commencing appropriate studies after placement is effective when, as here, the agency operating with the approval and under the supervision of the Commissioner has already had these children for a substantial period. The court feels that it was incumbent upon all those connected with this matter to collect the necessary information and explore the available avenues preparatory to obtaining the actual order of placement. If this were so, and the available alternatives known to the Commissioner, he would have been in a position to effectuate the court’s intention and *171 affirmatively report as directed after the two-week period delineated in the original order of placement.
The court specifically admonishes that it considers these short adjournments subsequent to an order of placement to be effective tools for monitoring the performance of agencies receiving children through this court and that it expects the expeditious finalization of foster or group home arrangements and reports to the court containing specific information in response to specific questions. The court intends to. closely monitor all placements to its satisfaction instead of leaving so much to the uncontrolled discretion of others. Its responsibilities to those over whom it takes jurisdiction will not in good conscience permit any less.